**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4019**

UNITED STATES OF AMERICA,

    Plaintiff – Appellee,

  v.

ROBERT F. MCDONNELL,

    Defendant – Appellant.

--------------------------------------

FORMER VIRGINIA ATTORNEYS GENERAL; ANDREW P. MILLER; ANTHONY
FRANCIS TROY; J. MARSHALL COLEMAN; MARY SUE TERRY; STEPHEN
DOUGLAS ROSENTHAL; MARK L. EARLEY; NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS; NANCY GERTNER, Law Professor;
CHARLES J. OGLETREE, JR., Law Professor; JOHN C. JEFFRIES,
JR., Law Professor; BENJAMIN TODD JEALOUS; REPUBLICAN
GOVERNORS PUBLIC POLICY COMMITTEE; FORMER STATE ATTORNEYS
GENERAL (NON-VIRGINIA); BUSINESS LEADERS AND PUBLIC POLICY
ADVOCATES; VIRGINIA LAW PROFESSORS; FORMER FEDERAL
OFFICIALS; MEMBERS AND FORMER MEMBERS OF THE VIRGINIA
GENERAL ASSEMBLY,

    Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  James R. Spencer, Senior
District Judge.  (3:14-cr-00012-JRS-1)

Argued:  May 12, 2015      Decided:  July 10, 2015

Before MOTZ, KING, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Motz and Judge King joined.

---

**ARGUED**: Noel J. Francisco, JONES DAY, Washington, D.C., for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF**: John L. Brownlee, Daniel I. Small, Christopher M. Iaquinto, Elizabeth N. Jochum, HOLLAND & KNIGHT LLP, Washington, D.C.; Henry W. Asbill, Charlotte H. Taylor, James M. Burnham, Ian Samuel, JONES DAY, Washington, D.C., for Appellant. Dana J. Boente, United States Attorney, Ryan S. Faulconer, Assistant United States Attorney, Raymond Hulser, Acting Chief, Public Integrity Section, Alexandria, Virginia, Michael S. Dry, Assistant United States Attorney, Jessica D. Aber, Assistant United States Attorney, David V. Harbach, II, Criminal Division, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. William H. Hurd, Stephen C. Piepgrass, TROUTMAN SANDERS LLP, Richmond, Virginia, for Amici Former Virginia Attorneys General Andrew P. Miller, Anthony Francis Troy, J. Marshall Coleman, Mary Sue Terry, Stephen Douglas Rosenthal, and Mark L. Earley. David B. Smith, SMITH & ZIMMERMAN, PLLC, Alexandria, Virginia; John D. Cline, LAW OFFICE OF JOHN D. CLINE, San Francisco, California, for Amicus National Association of Criminal Defense Lawyers. William W. Taylor, III, ZUCKERMAN SPAEDER LLP, Washington, D.C., for Amici Nancy Gertner, Law Professor, Charles J. Ogletree, Jr., Law Professor, and John C. Jeffries, Jr., Law Professor. Wyatt B. Durrette, Jr., Barrett E. Pope, Robert Rae Gordon, DURRETTECRUMP PLC, Richmond, Virginia, for Amicus Benjamin Todd Jealous. Charles J. Cooper, David H. Thompson, Peter A. Patterson, John D. Ohlendorf, COOPER & KIRK, PLLC, Washington, D.C., for Amicus Republican Governors Public Policy Committee, a/k/a RGPPC. Brian D. Boone, Emily C. McGowan, Charlotte, North Carolina, Edward T. Kang, ALSTON & BIRD LLP, Washington, D.C., for Amici Former State Attorneys General (Non-Virginia). Gregory N. Stillman, Norfolk, Virginia, Edward J. Fuhr, Johnathan E. Schronce, Richmond, Virginia, William J. Haun, HUNTON & WILLIAMS LLP, Washington, D.C., for Amici Business Leaders and Public Policy Advocates. Timothy M. Richardson, POOLE MAHONEY PC, Virginia Beach, Virginia, for Amici Virginia Law Professors. William J. Kilberg, Thomas G. Hungar, Helgi C. Walker, David Debold, Katherine C. Yarger, Jacob T. Spencer, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amici Former Federal Officials. John S. Davis, Joseph R. Pope, Jonathan T. Lucier, WILLIAMS MULLEN, Richmond, Virginia, for Amici Members and Former Members of the Virginia General Assembly.

---

THACKER, Circuit Judge:

Over the course of five weeks of trial, federal prosecutors sought to prove that former Governor of Virginia Robert F. McDonnell ("Appellant") and his wife, Maureen McDonnell, accepted money and lavish gifts in exchange for efforts to assist a Virginia company in securing state university testing of a dietary supplement the company had developed. The jury found Appellant guilty of eleven counts of corruption and not guilty of two counts of making a false statement.[1]

Appellant appeals his convictions, alleging a multitude of errors. Chiefly, Appellant challenges the jury instructions -- claiming the district court misstated the law -- and the sufficiency of the evidence presented against him. He also argues that his trial should have been severed from his wife's trial; that the district court's voir dire questioning violated his Sixth Amendment rights; and that the district court made several erroneous evidentiary rulings. Upon consideration of each of Appellant's contentions, we conclude that the jury's

---

[1] The jury also found Mrs. McDonnell guilty of eight counts of corruption and one count of obstruction of an official proceeding. The jury found her not guilty of three counts of corruption and one count of making a false statement. Her appeal is not at issue here, as it is pursued separately.

verdict must stand and that the district court's judgment should be affirmed.

I.

A.

On November 3, 2009, Appellant was elected the seventy-first Governor of Virginia. From the outset, he made economic development and the promotion of Virginia businesses priorities of his administration.

The economic downturn preceding the election had taken a personal toll on Appellant. Mobo Real Estate Partners LLC ("Mobo"), a business operated by Appellant and his sister, was losing money on a pair of beachfront rental properties in Virginia Beach. When Appellant became Governor, he and his sister were losing more than $40,000 each year. By 2011, they owed more than $11,000 per month in loan payments. Each year their loan balance increased, and by 2012, the outstanding balance was nearing $2.5 million.

Appellant was also piling up credit card debt. In January 2010, the month of his inauguration, Appellant and his wife had a combined credit card balance exceeding $74,000. Eight months later, in September 2010, the combined balance exceeded $90,000.

B.

While Appellant was campaigning on promises of economic development in Virginia, Virginia-based Star Scientific Inc. ("Star") and its founder and chief executive officer Jonnie Williams were close to launching a new product: Anatabloc. For years, Star had been evaluating the curative potential of anatabine, an alkaloid found in the tobacco plant, focusing on whether it could be used to treat chronic inflammation. Anatabloc was one of the anatabine-based dietary supplements Star developed as a result of these years of evaluation.

Star wanted the Food and Drug Administration to classify Anatabloc as a pharmaceutical. Otherwise, it would have to market Anatabloc as a nutraceutical, which generally has less profit potential than a pharmaceutical. Classification as a pharmaceutical would require expensive testing, clinical trials, and studies. But Star did not have the financial wherewithal to conduct the necessary testing, trials, and studies on its own. It needed outside research and funding.

C.

Appellant and Williams first met in December 2009 -- shortly after Appellant's election to the governorship but before his inauguration. Appellant had used Williams's plane during his campaign, and he wanted to thank Williams over dinner

5

in New York.[2]  During dinner, Williams ordered a $5,000 bottle of cognac and the conversation turned to the gown Appellant's wife would wear to Appellant's inauguration.  Williams mentioned that he knew Oscar de la Renta and offered to purchase Mrs. McDonnell an expensive custom dress.[3]

In October 2010, Appellant and Williams crossed paths again.  This time, the two were on the same plane -- Williams's plane -- making their way from California to Virginia.  During the six-hour flight, Williams extolled the virtues of Anatabloc and explained that he needed Appellant's help to move forward with the product:

> [W]hat I did was I explained to him how I
> discovered it.  I gave him a basic education
> on the -- on smoking, the diseases that
> don't happen with smokers and just tried to
> make sure he understood, you know, what I
> had discovered in this tobacco plant and
> that I was going to -- what I needed from

---

[2] Williams was one of several individuals who offered the use of a private plane to Appellant during his campaign on an as-needed basis.  Although Appellant had used Williams's plane during his campaign, the two men did not meet until December 2009.

[3] In the end, Williams did not purchase an inauguration dress for Mrs. McDonnell.  According to Williams, Appellant's chief counsel, Jacob Jasen Eige, called Williams, saying, "I understand that you're getting ready to purchase [Mrs.] McDonnell a dress for the inauguration.  I'm calling to let you know that you can't do that."  J.A. 2208 (internal quotation marks omitted).  Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

him was that I needed testing and I wanted
to have this done in Virginia.

J.A. 2211.

By the end of the flight, the two agreed that "independent testing in Virginia was a good idea." J.A. 2211. Appellant agreed to introduce Williams to Dr. William A. Hazel Jr., the Commonwealth's secretary of health and human resources.

In April 2011, Mrs. McDonnell invited Williams to join the first couple at a political rally in New York. "I'll have you seated with the Governor and we can go shopping now," Mrs. McDonnell said, according to Williams. J.A. 2222 (internal quotation marks omitted). So Williams took Mrs. McDonnell on a shopping spree; they lunched and shopped at Bergdorf Goodman and visited Oscar de la Renta and Louis Vuitton stores on Fifth Avenue. Williams bought Mrs. McDonnell dresses and a white leather coat from Oscar de la Renta; shoes, a purse, and a raincoat from Louis Vuitton; and a dress from Bergdorf Goodman. Williams spent approximately $20,000 on Mrs. McDonnell during this shopping spree. That evening, Williams sat with Appellant and Mrs. McDonnell during a political rally.

A few weeks later, on April 29, Williams joined Appellant and Mrs. McDonnell for a private dinner at the Governor's Mansion. The discussion at dinner centered on Anatabloc and the need for independent testing and studies.

7

Appellant, who had campaigned on promoting business in Virginia, was "intrigued that [Star] was a Virginia company with an idea," and he wanted to have Anatabloc studies conducted within the Commonwealth's borders. J.A. 6561.

Two days after this private dinner -- on May 1, 2011 -- Mrs. McDonnell received an email via Williams.[4] The email included a link to an article entitled "Star Scientific Has Home Run Potential," which discussed Star's research and stock. Mrs. McDonnell forwarded this email to Appellant at 12:17 p.m. Less than an hour later, Appellant texted his sister, asking for information about loans and bank options for their Mobo properties. Later that evening, Appellant emailed his daughter Cailin, asking her to send him information about the payments he still owed for her wedding.

The next day, May 2, Mrs. McDonnell and Williams met at the Governor's Mansion to discuss Anatabloc. However, Mrs. McDonnell began explaining her family's financial woes -- thoughts about filing for bankruptcy, high-interest loans, the decline in the real estate market, and credit card debt. Then, according to Williams, Mrs. McDonnell said, "I have a background

---

[4] Williams did not send the email to Mrs. McDonnell. However, the sender wrote, "Please give to the governor and his wife as per Jonnie Williams." G.S.A. 3. Citations to the "G.S.A." refer to the Supplemental Appendix filed by the Government.

in nutritional supplements and I can be helpful to you with this project, with your company. The Governor says it's okay for me to help you and -- but I need you to help me. I need you to help me with this financial situation." J.A. 2231 (internal quotation marks omitted). Mrs. McDonnell asked to borrow $50,000. Williams agreed to loan the money to the McDonnells. Mrs. McDonnell also mentioned that she and her husband owed $15,000 for their daughter's wedding reception. Again, Williams agreed to provide the money. Before cutting the checks, Williams called Appellant to "make sure [he] knew about it." J.A. 2233. "I called him and said that, you know, 'I met with Maureen. I understand the financial problems and I'm willing to help. I just wanted to make sure that you knew about this,'" Williams recounted at trial. Id. Appellant's response was "Thank you." Id.

Three days later, on May 5 at 11 a.m., Appellant met with Secretary Hazel and Chief of Staff Martin Kent to discuss the strategic plan for the state's health and human resources office. Shortly after the meeting, Appellant directed his assistant to forward to Hazel the article about Star that Mrs. McDonnell had earlier brought to Appellant's attention.

Williams returned to the Governor's Mansion on May 23, 2011, to deliver two checks for the amounts discussed on May 2: a $50,000 check made out to Mrs. McDonnell and a $15,000 check

that was not made out to anyone but was going to the wedding caterers. After Williams delivered these checks to Mrs. McDonnell, Appellant expressed his gratitude in a May 28 email to Williams:

> Johnnie. Thanks so much for alll your help with my family. Your very generous gift to Cailin was most appreciated as well as the golf round tomorrow for the boys. Maureen is excited about the trip to fla to learn more about the products . . . . Have a restful weekend with your family. Thanks.[5]

G.S.A. 20. The next day, as mentioned in the email, Appellant, his two sons, and his soon-to-be son-in-law spent the day at Kinloch Golf Club in Manakin-Sabot, Virginia. During this outing, they spent more than seven hours playing golf, eating, and shopping. Williams, who was not present, covered the $2,380.24 bill.

Also as mentioned in the email, Mrs. McDonnell traveled to Florida at the start of June to attend a Star-sponsored event at the Roskamp Institute.[6] While there, she addressed the audience, expressing her support for Star and its research. She also invited the audience to the launch for Anatabloc, which would be held at the Governor's Mansion. The

---

[5] Text messages and emails are quoted verbatim without identifying any mistakes in the original. Alterations have been made only when necessary for clarification.

[6] The Roskamp Institute is a private research institute that studies Alzheimer's disease.

same day -- June 1, 2011 -- she purchased 6,000 shares of Star stock at $5.1799 per share, for a total of $31,079.40.

Weeks later, Williams sent Appellant a letter about conducting Anatabloc studies in Virginia. Williams wrote, "I am suggesting that you use the attached protocol to initiate the 'Virginia study' of Anatabloc at the Medical College of Virginia and the University of Virginia School of Medicine, with an emphasis on endocrinology, cardiology, osteoarthritis and gastroenterology." G.S.A. 29. Appellant forwarded the letter and its attachments to Secretary Hazel for review.

Appellant's political action committee -- Opportunity Virginia (the "PAC") -- hosted and funded a retreat at the Omni Homestead Resort in Hot Springs, Virginia. The retreat began on June 23, 2011, and was attended by the top donors to Opportunity Virginia. Williams, "a $100,000 in-kind contributor to the campaign and the PAC," was invited, and he flew Appellant's children to the resort for the retreat. J.A. 6117. Appellant and Williams played golf together during the retreat. A few days later, Williams sent golf bags with brand new clubs and golf shoes to Appellant and one of his sons.

From July 28 to July 31, Appellant and his family vacationed at Williams's multi-million-dollar home at Smith Mountain Lake in Virginia. Williams allowed the McDonnells to stay there free of charge. He also paid $2,268 for the

11

McDonnells to rent a boat. And Williams provided transportation for the family: Appellant's children used Williams's Range Rover for the trip to the home, and he paid more than $600 to have his Ferrari delivered to the home for Appellant to use.

Appellant drove the Ferrari back to Richmond at the end of the vacation on July 31. During the three-hour drive, Mrs. McDonnell snapped several pictures of Appellant driving with the Ferrari's top down. Mrs. McDonnell emailed one of the photographs to Williams at 7:47 p.m. At 11:29 p.m., after returning from the Smith Mountain Lake vacation, Appellant directed Secretary Hazel to have his deputy attend a meeting about Anatabloc with Mrs. McDonnell at the Governor's Mansion the next day.

Hazel sent a staffer, Molly Huffstetler, to the August 1 meeting, which Williams also attended. During the meeting, Williams discussed clinical trials at the University of Virginia ("UVA") and Virginia Commonwealth University ("VCU"), home of the Medical College of Virginia ("MCV"). Then Williams and Mrs. McDonnell met with Dr. John Clore from VCU, who Williams said was "important, and he could cause studies to happen at VCU's medical school." J.A. 2273. Williams -- with Mrs. McDonnell at his side -- told Dr. Clore that clinical testing of Anatabloc in Virginia was important to Appellant. After the meeting ended, Mrs. McDonnell noticed the Rolex watch adorning Williams's

12

wrist. She mentioned that she wanted to get a Rolex for Appellant. When Williams asked if she wanted him to purchase one for Appellant, she responded affirmatively.

The next day -- August 2, 2011 -- Mrs. McDonnell purchased another 522 shares of Star stock at $3.82 per share, for a total of $1,994.04.

Appellant and one of his sons returned to Kinloch Golf Club on August 13, 2011. The bill for this golf outing, which Williams again paid, was $1,309.17. The next day, Williams purchased a Rolex from Malibu Jewelers in Malibu, California. The Rolex cost between $6,000 and $7,000 and featured a custom engraving: "Robert F. McDonnell, 71st Governor of Virginia." J.A. 2275 (internal quotation marks omitted). Mrs. McDonnell later took several pictures of Appellant showing off his new Rolex -- pictures that were later sent to Williams via text message.

Over the next few weeks, Governor's Mansion staff planned and coordinated a luncheon to launch Anatabloc -- an event paid for by Appellant's PAC. Invitations bore the Governor's seal and read, "Governor and Mrs. Robert F. McDonnell Request the Pleasure of your Company at a Luncheon." G.S.A. 104. Invitees included Dr. Clore and Dr. John Lazo from UVA. At the August 30 luncheon, each place setting featured samples of Anatabloc, and Williams handed out checks for grant

13

applications -- each for $25,000 -- to doctors from various medical institutions.[7]

Appellant also attended the luncheon. According to Lazo, Appellant asked attendees various questions about their thoughts about Anatabloc:

> So I think one question he asked us was, did we think that there was some scientific validity to the conversation and some of the pre-clinical studies that were discussed, or at least alluded to. He also, I think, asked us whether or not there was any reason to explore this further; would it help to have additional information. And also, he asked us about could this be something good for the Commonwealth, particularly as it relates to [the] economy or job creation.

J.A. 3344. According to Williams, Appellant was "[a]sking questions like . . . 'What are the end points here? What are you looking for to show efficacy with the studies? How are you going to proceed with that?'" Id. at 2283. Appellant also thanked the attendees for their presence and "talked about his interest in a Virginia company doing this, and his interest in the product." Id. at 3927. Overall, "[Appellant] was generally supportive. . . . [T]hat was the purpose." Id. at 2284.

---

[7] In total, Williams provided $200,000 for grant applications. All of the checks were distributed to researchers either at or about the time of the Anatabloc launch luncheon at the Governor's Mansion.

14

Despite the fanfare of the luncheon, Star's President, Paul L. Perito, began to worry that Star had lost the support of UVA and VCU. In the fall of 2011, Perito was working with those universities to file grant applications. During a particular call with UVA officials, Perito felt the officials were unprepared. According to Perito, when Williams learned about this information, "[h]e was furious and said, 'I can't understand it. [Appellant] and his wife are so supportive of this and suddenly the administration has no interest.'" J.A. 3934.

D.

Prior to the beginning of 2012, Mrs. McDonnell sold all of her 6,522 shares of Star stock for $15,279.45, resulting in a loss of more than $17,000. This allowed Appellant to omit disclosure of the stock purchases on a required financial disclosure form known as a Statement of Economic Interest. Then on January 20, 2012 -- four days after the Statement of Economic Interest had been filed -- Mrs. McDonnell purchased 6,672 shares of Star stock at $2.29 per share, for a total of $15,276.88.

In the meantime, on January 7, 2012, Appellant made another golf visit to Kinloch Golf Club, running up a $1,368.91 bill that Williams again paid. Appellant omitted this golf outing and the 2011 golf trips from his Statements of Economic Interest. See J.A. 723 (noting Appellant's "deliberate omission

15

of his golf-related gifts paid by Jonnie Williams"). Appellant also omitted from his Statement of Economic Interest the $15,000 check for the caterers at his daughter's wedding.

Also in January 2012, Williams discussed the Mobo properties with Mrs. McDonnell, who wanted additional loans. As a result, Williams agreed to loan more money. At the same time, he mentioned to Mrs. McDonnell that the studies with UVA were proceeding slowly. Mrs. McDonnell was "furious when [Williams] told her that [they were] bogged down in the administration." J.A. 2308. Later, Mrs. McDonnell called Williams to advise him that she had relayed this information to Appellant, who "want[ed] the contact information of the people that [Star] [was] dealing with at [UVA]." Id. at 2309 (internal quotation marks omitted).

Appellant followed up on these discussions by calling Williams on February 3, 2012, to talk about a $50,000 loan. Initially, Appellant wanted a cash loan, but Williams mentioned that he could loan stock to Appellant. Williams proposed "that he could loan that stock either to [Appellant's] wife or he could loan it to [Mobo]." J.A. 6224. This conversation continued to February 29, when Williams visited the Governor's Mansion. During this meeting, Appellant and Williams discussed the potential terms of a stock transfer. However, Appellant and Williams did not move forward with this idea because Williams

16

discovered he would have to report a stock transfer to the Securities and Exchange Commission. At trial, Williams testified that he did not want to transfer Star stock because he "didn't want anyone to know that I was helping the Governor financially with his problems while he was helping our company." Id. at 2333-34. When asked what he expected in return from Appellant, Williams testified, "I expected what had already happened, that he would continue to help me move this product forward in Virginia" by "assisting with the universities, with the testing, or help with government employees, or publicly supporting the product." Id. at 2355. In the end, Williams agreed to make a $50,000 loan, writing a check in this amount to the order of Mobo on March 6.

Also on February 3, one of Williams's employees responded to Mrs. McDonnell's request for a list of doctors Williams wished to invite to an upcoming healthcare industry leaders reception at the Governor's Mansion. The employee emailed the list of doctors to Mrs. McDonnell. Four days later -- on February 7 -- Mrs. McDonnell sent a revised list of invitees for this event, a list that now included the doctors identified by Williams. The next day, Sarah Scarbrough, director of the Governor's Mansion, sent an email to Secretary Hazel's assistant, Elaina Schramm. Scarbrough informed Schramm that "[t]he First Lady and Governor were going over the list

17

last night for the healthcare industry event.  The Governor wants to make sure [head officers at UVA and VCU, along with those of other institutions,] are included in the list."  G.S.A. 146.

Mrs. McDonnell received an email, as previously requested by Appellant, containing the names of the UVA officials with whom Star had been working.  She forwarded this list to Appellant and his chief counsel, Jacob Jasen Eige, on February 9.  The next day, while riding with Appellant, Mrs. McDonnell followed up with Eige:

> Pls call Jonnie today [and] get him to fill
> u in on where this is at.  Gov wants to know
> why nothing has developed w studies after
> Jonnie gave $200,000.  I'm just trying to
> talk w Jonnie.  Gov wants to get this going
> w VCU MCV.  Pls let us know what u find out
> after we return . . . .

G.S.A. 154.[8]

Less than a week later -- on February 16, 2012 -- Appellant emailed Williams to check on the status of certificates and documents relating to loans Williams was providing for Mobo.  Six minutes after Appellant sent this

---

[8] The $200,000 mentioned in Mrs. McDonnell's email to chief counsel Eige referred to checks that Star distributed to researchers either at or about the time of the Anatabloc launch luncheon at the Governor's Mansion.

18

email, he emailed Eige: "Pls see me about anatabloc issues at VCU and UVA. Thx." G.S.A. 157.

The healthcare industry leaders reception was held on February 29 -- the same day as Appellant's private meeting about securing a loan from Williams. Following the reception, Appellant, Mrs. McDonnell, Williams, and two doctors went out for a $1,400 dinner on Williams's dime. During dinner the diners discussed Anatabloc. Mrs. McDonnell talked about her use of Anatabloc, and Appellant asked one of the doctors -- a Star consultant -- "How big of a discovery is this?" J.A. 2728 (internal quotation marks omitted). At one point during the dinner Mrs. McDonnell invited the two doctors to stay at the Governor's Mansion for the evening -- an offer the doctors accepted.

On March 21, 2012, Appellant met with Virginia Secretary of Administration Lisa Hicks-Thomas, who oversaw state employee health plans and helped determine which drugs would be covered by the state health plan. At one point during the meeting, Appellant reached into his pocket, retrieving a bottle of Anatabloc. He told Hicks-Thomas that Anatabloc was "working well for him, and that he thought it would be good for . . . state employees." J.A. 4227. He then asked Hicks-Thomas to meet with representatives from Star.

Almost two months later -- on May 18, 2012 -- Appellant sent Williams a text message concerning yet another loan: "Johnnie. Per voicemail would like to see if you could extend another 20k loan for this year. Call if possible and I'll ask mike to send instructions. Thx bob." G.S.A. 166. Twelve minutes later, Williams responded, "Done, tell me who to make it out to and address. Will FedEx. Jonnie." Id. at 168.

Later the same month -- from May 18 to May 26 -- Appellant and his family vacationed at Kiawah Island in South Carolina. According to Appellant, the $23,000 vacation was a gift from William H. Goodwin Jr., whom Appellant characterized as a personal friend. Appellant did not report this gift on his 2012 Statement of Economic Interest. He said he did not need to report it because it fell under the "personal friend" exception to the reporting requirements.

Between April and July 2012, Appellant emailed and texted Williams about Star stock on four occasions, each coinciding with a rise in the stock price. In response to a text sent on July 3, Williams said, "Johns Hopkins human clinical trials report on aug 8. If you need cash let me know. Let's go golfing and sailing Chatham Bars inn Chatham mass labor day weekend if you can. Business about to break out strong. Jonnie." G.S.A. 170.

20

Appellant and his wife took Williams up on his Labor Day weekend vacation offer. Williams spent more than $7,300 on this vacation for the McDonnells. Williams paid the McDonnells' share of a $5,823.79 bill for a private clambake. Also joining in on the weekend excursion was one of the doctors who attended the February healthcare leaders reception, whom Williams invited in an attempt "to try to help get the Governor more involved." J.A. 2371.

Appellant said he learned in December 2012 that Mrs. McDonnell had repurchased Star stock in January 2012 -- despite having sold her entire holding of Star stock the previous year. Appellant testified that he "was pretty upset with her." J.A. 6270. This revelation led to a tense conversation about reporting requirements:

> [I]t was her money that she had used for this. But I told her, you know, "Listen. If you have this stock, you know, this is" -- "again, triggers a reporting requirement for me. I can do it, but I need" -- "I just don't" -- "I really don't appreciate you doing things that really" -- "that affect me without" -- "without me knowing about it."

Id. at 6271. That Christmas, Mrs. McDonnell transferred her Star stock to her children as a gift. This again allowed Appellant to file a Statement of Economic Interest that did not report ownership of the stock. That same month -- December 2012

21

-- Williams gave Appellant's daughter Jeanine a $10,000 wedding gift.

E.

Eventually, all of these events came to light. And on January 21, 2014, a grand jury indicted Appellant and Mrs. McDonnell in a fourteen-count indictment. Appellant and Mrs. McDonnell were charged with one count of conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. § 1349; three counts of honest-services wire fraud, in violation of 18 U.S.C. § 1343; one count of conspiracy to obtain property under color of official right, in violation of 18 U.S.C. § 1951; six counts of obtaining property under color of official right, in violation of 18 U.S.C. § 1951; two counts of making a false statement, in violation of 18 U.S.C. § 1014; and one count of obstruction of official proceedings, in violation of 18 U.S.C. § 1512(c)(2).

Ultimately, the jury verdict of September 4, 2014, found Appellant not guilty of the false statements counts but guilty of all eleven counts of corruption.[9]

---

[9] The corruption counts include one count of conspiracy to commit honest-services wire fraud pursuant to 18 U.S.C. § 1349; three counts of honest-services wire fraud pursuant to 18 U.S.C. § 1343; one count of conspiracy to obtain property under color of official right pursuant to 18 U.S.C. § 1951; and six counts of obtaining property under color of official right pursuant to
(Continued)

22

At sentencing the Government requested a sentence of 78 months -- or six and a half years -- of imprisonment, which was at the low end of the applicable Sentencing Guidelines range. However, the district court departed downward and sentenced Appellant to two years of imprisonment, followed by two years of supervised release. Appellant now challenges his convictions, asserting a litany of errors.

## II.

## A.

### Motion for Severance

To begin, Appellant argues that the district court erred when it denied both his motion for severance and his request for ex parte consideration of this motion. We review these rulings for an abuse of discretion. See United States v. Lighty, 616 F.3d 321, 348 (4th Cir. 2010) (severance); RZS Holdings AVV v. PDVSA Petroleo S.A., 506 F.3d 350, 356 (4th Cir. 2007) (ex parte proceeding).

### 1.

Appellant contends that he was entitled to a trial separate from the trial of Mrs. McDonnell. He argues that a joint trial precluded him from calling Mrs. McDonnell as a

---

18 U.S.C. § 1951. Only Mrs. McDonnell was charged with obstruction of official proceedings.

witness and thus introducing exculpatory testimony. The district court denied Appellant's motion for severance. Appellant claims this decision was an abuse of the court's discretion.

In general, "defendants indicted together should be tried together." Lighty, 616 F.3d at 348. This is especially true when, as in this case, the defendants are charged with conspiracy. See United States v. Parodi, 703 F.2d 768, 779 (4th Cir. 1983). So a defendant seeking severance based on the need for a co-defendant's testimony must make an initial showing of "(1) a bona fide need for the testimony of his co-defendant, (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege, (3) the substance of his co-defendant's testimony, and (4) the exculpatory nature and effect of such testimony." Id. After the initial showing is made, a district court should

> (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) assess the extent of prejudice caused by the absence of the testimony; (3) pay close attention to judicial administration and economy; (4) give weight to the timeliness of the motion[;] and (5) consider the likelihood that the co-defendant's testimony could be impeached.

Id.

Appellant failed to satisfy even the initial showing requirements of United States v. Parodi. The district court denied Appellant's motion for severance because Appellant offered only vague and conclusory statements regarding the substance of Mrs. McDonnell's testimony. As we expressed in Parodi, vague and conclusory statements regarding potential testimony are not enough to establish the substance of a co-defendant's testimony. See 703 F.2d at 780.

Appellant's motion to sever paints a picture of Mrs. McDonnell's potential testimony in broad strokes without filling in any details:

> First, her testimony would disprove the Government's primary claim that the McDonnells acted in concert through a criminal conspiracy to corruptly accept gifts and loans in exchange for Mr. McDonnell using his office to benefit Williams and his company. Second, her testimony would refute the Government's allegation that Mr. McDonnell agreed or promised to use his office to improperly "promote" Star's products or to "obtain research studies for Star Scientific's products." Third, Mrs. McDonnell would refute the Government's allegation that she solicited certain gifts and loans identified in the Indictment. Finally, Mrs. McDonnell would refute the Government's allegation that the McDonnells "took steps . . . to conceal" their supposed scheme.

J.A. 296 (alternation in original) (citations omitted). Presented with only these unadorned statements regarding the substance of Mrs. McDonnell's potential testimony, the district

25

court appropriately exercised its discretion when it denied the motion to sever.

2.

Appellant claimed he could provide a more detailed account of the substance of Mrs. McDonnell's potential testimony -- an account he offered to share with the district court on the condition that the district court review the evidence ex parte. The district court denied this invitation, finding an ex parte proceeding would be inappropriate.

Ex parte proceedings and communications are disfavored because they are "fundamentally at variance with our conceptions of due process." Doe v. Hampton, 566 F.2d 265, 276 (D.C. Cir. 1977), quoted in Thompson v. Greene, 427 F.3d 263, 269 n.7 (4th Cir. 2005). However, such proceedings and communications may be permissible in limited circumstances. "[O]ur analysis should focus, first, on the parties' opportunity to participate in the court's decision and, second, on whether the ex parte proceedings were unfairly prejudicial." RZS Holdings AVV, 506 F.3d at 357.

Ex parte proceedings were not justified in this case. Appellant sought to withhold from the Government all of the information necessary to establish the necessity of severance. This proposal would have barred the Government from challenging whether Appellant actually satisfied the initial showing

26

required by Parodi.  If the district court proceeded as Appellant requested, it would have been the only entity in a position to challenge Appellant's contentions.  The district court was reluctant to assume the role of an advocate when evaluating "a motion to sever[, which] requires a fact-intensive, multi-factored analysis for which there is a heightened need for well-informed advocacy."  J.A. 351.[10]  It

---

[10] In United States v. Napue, the Seventh Circuit elaborated on the problems presented by ex parte communications between a court and the Government:

> Ex parte communications between the government and the court deprive the defendant of notice of the precise content of the communications and an opportunity to respond.  These communications thereby can create both the appearance of impropriety and the possibility of actual misconduct.  Even where the government acts in good faith and diligently attempts to present information fairly during an ex parte proceeding, the government's information is likely to be less reliable and the court's ultimate findings less accurate than if the defendant had been permitted to participate.  However impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case.  An ex parte proceeding places a substantial burden upon the trial judge to perform what is naturally and properly the function of an advocate.

834 F.2d 1311, 1318–19 (7th Cir. 1987) (emphasis omitted) (citations omitted) (internal quotation marks omitted).  The reversal of roles in this case does not change the equation. See Alderman v. United States, 394 U.S. 165, 184 (1969) ("As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent (Continued)

properly exercised its discretion by denying Appellant's request.

Appellant also maintains that the district court erred by failing to defer its ruling on the motion to sever until 14 days prior to trial. The district court was not obligated to consider this request because Appellant waited until his reply to argue this issue. Cf. U.S. S.E.C. v. Pirate Investor LLC, 580 F.3d 233, 255 n.23 (4th Cir. 2009) ("Ordinarily we do not consider arguments raised for the first time in a reply brief . . . ."); Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC, 708 F. Supp. 2d 527, 535 (D. Md. 2010) (applying this principle to reply memoranda). We are satisfied, therefore, that the district court did not abuse its discretion by denying this request outright.

Appellant simply failed to provide adequate justification for his claim that a severance was warranted. He was not entitled to an ex parte examination of his evidence; he was not entitled to deferral of the district court's ruling. Accordingly, we affirm the denial of Appellant's motion to sever.

---

inadequacy of ex parte procedures as a means for their accurate resolution, the displacement of well-informed advocacy necessarily becomes less justifiable." (emphasis omitted)).

B.

Voir Dire

Appellant next argues that the district court failed to adequately question prospective jurors on the subject of pretrial publicity. He complains that, during the voir dire proceedings, the court declined his request for individual questioning on this topic. Instead, the court polled the members of the venire as a group, asking whether any of them believed themselves to be incapable of "put[ting] aside whatever it is that [they had] heard." J.A. 1692. The court did call eight prospective jurors to the bench for one-on-one questioning, but only after the defense singled them out on the basis of their responses to a jury selection questionnaire. Appellant argues that such "perfunctory" questioning violated his Sixth Amendment right to an impartial jury. Appellant's Br. 65. Because "[t]he conduct of voir dire necessarily is committed to the sound discretion of the trial court," United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996) (en banc), we also review this contention for abuse of discretion, see United States v. Caro, 597 F.3d 608, 613 (4th Cir. 2010).

Appellant's argument begins inauspiciously, with an assertion that the Supreme Court's decision in Skilling v. United States, 130 S. Ct. 2896 (2010), establishes minimum requirements for voir dire in "publicity-saturated" cases like

29

this one.  Appellant's Br. 22.  In Skilling, he claims, the Court approved the voir dire procedure "only because" the trial court asked prospective jurors to indicate whether they had formed an opinion about the defendant's guilt or innocence and later examined them individually about pretrial publicity.  Id. Appellant then reasons that, because the trial court in this case took neither of those steps, it necessarily "failed to 'provide a reasonable assurance that prejudice would be discovered if present.'"  Id. (quoting Lancaster, 96 F.3d at 740).

Skilling, however, does not purport to hand down commandments for the proper conduct of voir dire proceedings. See 130 S. Ct. at 2918 (explaining that the legal issue under review was, narrowly, "the adequacy of jury selection in Skilling's case" (emphasis supplied)).  On the contrary, the Court in Skilling recommitted itself to the principle that jury selection is unsusceptible to any "hard-and-fast formula"; as always, it remains "particularly within the province of the trial judge."  Id. at 2917 (internal quotation marks omitted); see also United States v. Wood, 299 U.S. 123, 145-46 (1936) (stating that procedures for detecting and rooting out juror bias cannot be "chained to any ancient and artificial formula"). Trial judges, as we have repeatedly recognized, retain broad discretion over the conduct of voir dire, see, e.g., United

30

States v. Jeffery, 631 F.3d 669, 673 (4th Cir. 2011), both as a general matter and in the area of pretrial publicity, specifically, see, e.g., United States v. Bailey, 112 F.3d 758, 770 (4th Cir. 1997); United States v. Bakker, 925 F.2d 728, 733-34 (4th Cir. 1991). The Supreme Court has itself emphasized the "wide discretion" that trial courts enjoy in questioning prospective jurors about pretrial publicity:

> Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

Mu'Min v. Virginia, 500 U.S. 415, 427 (1991).

In his opening brief, Appellant accuses the district court of "limit[ing] voir dire on this issue to asking the prospective jurors en masse to sit down if they felt they could be fair." Appellant's Br. 65. The court, though, did a good deal more than that.

Jury selection in this case commenced with a court-approved jury questionnaire spanning 99 questions, four of which pressed prospective jurors for information about their exposure

31

to pretrial publicity.[11]  The questionnaire -- by and large, a condensed version of a slightly longer proposed questionnaire that the parties submitted jointly -- asked respondents to state whether they had "seen, heard or read anything" about the case; "[h]ow closely" they had followed news about the case; and from which types of media they had heard about it.  J.A. 592-93.  It then asked whether each respondent had "expressed an opinion about this case or about those involved to anyone," and if so, to elaborate on both "the circumstances" and the opinion expressed.  Id. at 593.

Appellant makes much of the fact that the jury questionnaire merely asked whether prospective jurors had "expressed" an opinion about the case, rather than whether they had formed an opinion about it.  Appellant, however, bears much of the responsibility for the wording and scope of questions on that document.  And while the jointly proposed jury questionnaire from which the final questionnaire was culled did, indeed, ask whether prospective jurors had "formed" an opinion about the case, the wording of this proposed question was suspect.  It asked: "Based on what you have read, heard, seen,

_____

[11] Another section of the questionnaire asked prospective jurors to discuss their news consumption more generally. Respondents were instructed to list, among other things, the print and online news sources they read most often and any websites they visit regularly.

32

and/or overheard in conversations, please tell us what opinions, if any, you have formed about the guilt or innocence of Robert F. McDonnell." J.A. 527. So worded, this question invites respondents to deliberate on the defendant's guilt or innocence and to stake out a position before even a single juror has been seated. The court was justified in rejecting it.[12]

Later, the court did exercise its discretion to question the prospective jurors as a group, instead of individually, on the subject of pretrial publicity. See Bakker, 925 F.2d at 734 ("[I]t is well established that a trial judge may question prospective jurors collectively rather than individually."). During this portion of the in-court voir dire, the court asked the members of the venire, collectively, to stand up if they had read, heard, or seen any media reports about the case. The court then asked the prospective jurors to

---

[12] Indeed, the court's decision not to pose Appellant's suggested question finds support in the Supreme Court's guidance on matters of pretrial publicity. See Mu'Min, 500 U.S. at 430 (explaining that the question for voir dire is "whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant" (alteration in original) (emphasis supplied) (internal quotation marks omitted)); Irvin v. Dowd, 366 U.S. 717, 723 (1961) ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.").

sit down if, despite this, they believed they were "able to put aside whatever it is that [they] heard, listen to the evidence in this case and be fair to both sides." J.A. 1691-92. Even still, the court invited defense counsel to identify any specific veniremen it would like to question further on this subject. In response, Appellant's counsel brought forward the names of eight prospective jurors, and the court proceeded to summon each of those prospective jurors to the bench for individual questioning. The court struck one of these individuals, without objection, based on her responses to its questions. When this process was complete, the court asked Appellant's counsel whether there was "[a]nybody else" he wished to question. J.A. 1706. "Not on publicity," counsel said. Id.

Appellant, relying on our decision in United States v. Hankish, 502 F.2d 71 (4th Cir. 1974), argues that the prospective jurors' acknowledgment that they had been exposed to pretrial publicity obligated the trial court to question every single one of them -- not merely one at a time, but outside of the others' presence. See Appellant's Br. 65. Hankish, however, is inapplicable. The error in that case was a district court's refusal to poll jurors, after they had already been seated, to discern whether any of them had read a particular, "highly prejudicial" article that ran in the local newspaper on the second day of the trial. 502 F.2d at 76. We did not hold

34

then, and have not held since, that individual questioning, out of earshot of the rest of the venire, is required to alleviate generalized concerns about the pernicious effects of pretrial publicity. On the contrary, we have held that merely asking for a show of hands was not an abuse of discretion. See Bailey, 112 F.3d at 769-70 (finding no abuse of discretion where a court asked prospective jurors to raise their hands if they had heard or read about the case and, separately, if "anything they had heard would predispose them to favor one side or the other").

We are satisfied that the trial court's questioning in this case was adequate to "provide a reasonable assurance that prejudice would be discovered if present." Lancaster, 96 F.3d at 740 (internal quotation marks omitted); see also United States v. Hsu, 364 F.3d 192, 203-04 (4th Cir. 2004). And Appellant does not contend that any actual juror bias has been discovered. We conclude, therefore, that the court did not abuse its discretion.

## C.

### Evidentiary Rulings

Appellant asserts the district court made multiple erroneous evidentiary rulings. In general, we review evidentiary rulings for an abuse of discretion, affording substantial deference to the district court. See United States v. Medford, 661 F.3d 746, 751 (4th Cir. 2011). "A district

35

court abuses its discretion if its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (citations omitted). Reversal is appropriate if we have "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id. (internal quotation marks omitted).

1.

Exclusion of Expert Testimony

Appellant objects to the exclusion of his proposed expert testimony about Williams's cooperation agreement with the Government as well as expert testimony about the Statements of Economic Interest. We reject these claims, as the trial court's decisions to exclude this evidence were not abuses of discretion.

a.

First, Appellant argues that he should have been permitted to present expert testimony about Williams's cooperation agreement with the Government, which provided Williams with transactional immunity. In a letter dated May 30, 2014, the Government outlined the immunized conduct:

> (1) conduct involving his agreement to provide, and his provision of, things of value to former Virginia Governor Robert F.

36

> McDonnell, former First Lady of Virginia Maureen P. McDonnell, and their family members; (2) conduct related to loans Williams received from 2009 to 2012 in exchange for his pledge of Star Scientific stock; and (3) conduct related to Williams' gifts of Star Scientific stock to certain trusts from 2009 to 2012.

J.A. 7918. Appellant offered the expert testimony of Peter White -- a partner at Schulte Roth & Zabel LLP and former Assistant United States Attorney -- to "explain[] transactional immunity, its value, and its uniqueness" and to "help[] the jury understand Williams's deal so it could assess his credibility." Appellant's Br. 78.

Expert testimony cannot be used for the sole purpose of undermining a witness's credibility. See United States v. Allen, 716 F.3d 98, 105-06 (4th Cir. 2013). Here, the defense wished to present White's testimony in order to emphasize the rarity of Williams's agreement and to imply, as a result, that Williams had more reason to provide false or greatly exaggerated testimony. In other words, the sole purpose of White's testimony was to undermine Williams's credibility. This is a matter best left to cross examination. Accordingly, we cannot conclude that the district court's decision to exclude this evidence was an abuse of discretion. See Allen, 716 F.3d at 106 ("A juror can connect the dots and understand the implications that a plea agreement might have on a codefendant's testimony --

37

it is certainly within the realm of common sense that certain witnesses would have an incentive to incriminate the defendant in exchange for a lower sentence." (internal quotation marks omitted)).[13]

### b.

Second, Appellant argues that he should have been permitted to present expert testimony about the Statements of Economic Interest. Appellant offered the expert testimony of Norman A. Thomas -- a private attorney who formerly worked in

---

[13] Appellant also contests the exclusion of his proposed lay witness testimony about the rarity of Williams's agreement. At trial, the court sustained the Government's objection after defense counsel asked Williams whether he understood "how unusual it is . . . to get transactional immunity" and again after defense counsel asked an FBI special agent whether he had "ever seen a cooperating witness get the kind of deal that Mr. Williams got." J.A. 2778, 5064. Appellant claims this testimony would have helped the jury assess Williams's credibility. In relevant part, Rule 701 of the Federal Rules of Evidence requires that opinion testimony from a lay witness must be "helpful to clearly understanding the witness's testimony." Fed. R. Evid. 701(b); see also United States v. Hassan, 742 F.3d 104, 136 (4th Cir. 2014) ("Lay opinion testimony is particularly useful when . . . the terms and concepts being discussed . . . are likely to be unfamiliar to the jury."). Juries are familiar with the general import and effect of immunity agreements. Cf. Allen, 716 F.3d at 106 (discussing jurors' ability to understand the implications of a plea agreement). Here, the jury was informed of the contents of Williams's agreement, and Williams testified about the agreement and his understanding of the immunities from prosecution it afforded him. The jury did not need additional testimony regarding what types of agreements are more common than others to assess Williams's credibility. In other words, the district court reasonably concluded that the testimony would not have been helpful.

the Office of the Attorney General of Virginia and served as a judge -- to explain the vagueness and complexity of the Statements of Economic Interest. According to Appellant, Thomas also would have explained that Appellant's Statements of Economic Interest evidenced a reasonable understanding of the disclosure requirements.

Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "The helpfulness requirement of Rule 702 thus prohibits the use of expert testimony related to matters which are obviously . . . within the common knowledge of jurors." United States v. Lespier, 725 F.3d 437, 449 (4th Cir. 2013) (alteration in original) (internal quotations marks omitted).

The district court excluded the testimony of Thomas because it would not be helpful to the jury. As the court observed, the jurors were "capable of reading and assessing the complexity of the [Statements] for themselves." J.A. 719. Generally speaking, one does not need any special skills or expertise to recognize that something is complex. Accordingly, this matter was plainly within the common knowledge of the jurors. Similarly, the jurors did not need expert assistance to assess the reasonableness of Appellant's opinions about what he did and did not have to disclose. The district court reasonably concluded that Thomas's testimony would not have been helpful.

As a result, we cannot conclude that the district court's decision to exclude this evidence was an abuse of discretion.

2.

Admission of Statements of Economic Interest

Appellant objects to the admission of the Statements of Economic Interest filed by Appellant during his time in office. Appellant moved in limine to exclude evidence relating to the Statements of Economic Interest, arguing the Statements of Economic Interest would have little to no probative value and their admission would confuse the issues and mislead the jury.

The Government, on the other hand, characterized the Statements of Economic Interest and related evidence as concealment evidence, which would reveal Appellant's "corrupt intent and consciousness of guilt." J.A. 723. In support of this proposition, the Government offered four examples of how the Statements of Economic Interest amounted to concealment evidence:

> [F]irst, because of [Appellant's] deliberate omission of his golf-related gifts paid by Jonnie Williams; second, because of [Appellant's] deliberate omission of the $15,000 check from Mr. Williams to pay the remainder of the catering bill the McDonnells owed for their daughter's wedding; third, as the reason why Mrs. McDonnell sold and repurchased all Star stock held in her account on dates flanking the due date for [Appellant's] 2011 [Statement of Economic Interest], and why the next year, she similarly unloaded Star

40

stock to [Appellant's] children on December 26, 2012, such that less than $10,000 worth of Star stock remained in her account at year-end; and fourth, as the reason why [Appellant] had Mr. Williams direct $70,000 in loan proceeds to [Mobo].

Id. at 723–24 (citations omitted).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Id. 403.

The district court admitted the Statements of Economic Interest because they were relevant "to concealment and may be probative of intent to defraud" and because "admission . . . will not unfairly prejudice [Appellant] because there is no suggestion, and there will be none at trial, that [Appellant] violated Virginia's ethics laws or reporting requirements." J.A. 760. Indeed, an attempt to conceal actions may indicate an individual has a guilty conscience or is aware of the unlawfulness of the actions. See United States v. Zayyad, 741 F.3d 452, 463 (4th Cir. 2014). Because the Statements of Economic Interest did not include various gifts, stock

41

transactions, and loans from Williams to Appellant -- omissions Appellant sought to explain during trial[14] -- the structuring of the loans and gifts and failures to report could be seen as efforts to conceal Appellant's dealings with Williams. The district court correctly observed as much. And the district court weighed the probative value of this evidence against any dangers that would accompanying its admission. Accordingly, we cannot conclude that the district court's decision to admit this evidence was an abuse of discretion.

3.

Admission of Other Gifts Evidence

Appellant objects to the admission of evidence that he accepted a gift of the Kiawah vacation from Goodwin and that he

---

[14] Appellant testified that he should have reported -- but did not report -- golf outings provided by Williams in 2011. He did not report Williams's $15,000 check for catering at Appellant's daughter's wedding, characterizing the check as a wedding gift to his daughter. Appellant instructed Williams to write loan checks to Mobo, circumventing disclosure requirements. In both 2011 and 2012, Mrs. McDonnell unloaded shares of Star stock prior to the filing dates for the Statements of Economic Interest so her ownership did not have to be reported. But after the 2011 Statement of Economic Interest was filed, Mrs. McDonnell repurchased shares of Star stock. Appellant testified that "it was not a big deal" if he had to report ownership of Star stock. J.A. 6276. He claimed that he encouraged his wife to sell the stock in 2011 because it was a risky investment. He also claimed that Mrs. McDonnell repurchased and again transferred Star stock in 2012 because she wanted to give the stock to their children as a Christmas present.

42

did not disclose this gift pursuant to the "personal friend" exception to Virginia's reporting requirements. Appellant moved in limine to exclude this evidence as extrinsic evidence of unrelated alleged acts with no probative value of his intent. The Government responded that this evidence showed Appellant's knowledge of the "personal friend" exception to reporting requirements. This evidence, the Government further noted, would be "competent evidence of absence of mistake or lack of accident when it comes to assessing [Appellant's] intent in failing to disclose the gifts and loans from Mr. Williams." J.A. 731.

As a general rule, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. 404(b)(2).

The district court admitted the evidence of the Kiawah vacation omission because it was used to show knowledge and lack of mistake. The omission of the gift from Goodwin, the district court determined, "is similar to the act the Government seeks to prove -- omission of gifts from Williams pursuant to the

43

personal friend exception." J.A. 761. This evidence established that Appellant knew about the "personal friend" exception and omitted certain gifts pursuant to this exception. Thus, Appellant's knowledge and the absence of mistake was "relevant to, and probative of, his alleged intent to defraud." Id. Rule 404 permits the admission of evidence of intent and knowledge, and in our view, the district court could conclude that the Goodwin evidence was admissible for these purposes. Therefore, we cannot conclude that the district court's decision to admit this evidence was an abuse of discretion.

4.

Admission of Email Exchange Regarding Free Golf

Appellant objects to the admission of an email exchange about obtaining free rounds of golf. On January 4, 2013, Emily Rabbitt -- Appellant's travel aide and deputy director of scheduling -- asked Adam Zubowsky for advice about planning golf trips for Appellant. Zubowsky -- once Appellant's travel aide and later Appellant's son-in-law -- responded in an email dated January 4, 2013:

> Yes basically this means find out who we know in these cities, that owns golf courses and will let me and my family play for free, or at a reduced cost. Also finding out where to stay for free / or reduced cost. So this means . . . find out about pac donors, and rga donors, who will host rfm.

J.A. 7921.

44

During trial, Appellant objected to the admission of this email, asserting that this evidence was not relevant and was extraordinarily prejudicial. In post-trial motions and on appeal, however, Appellant has claimed the exchange was inadmissible hearsay and inadmissible character evidence. Because Appellant did not object at trial on these grounds, our review is for plain error. See United States v. Bennett, 698 F.3d 194, 200 (4th Cir. 2012).

On plain error review, an appellant "bears the burden of establishing (1) that the district court erred; (2) that the error was plain; and (3) that the error affect[ed his] substantial rights." Bennett, 698 F.3d at 200 (alteration in original) (internal quotation marks omitted). An error affects an individual's substantial rights if it was prejudicial, "which means that there must be a reasonable probability that the error affected the outcome of the trial." United States v. Marcus, 130 S. Ct. 2159, 2164 (2010). The mere possibility that the error affected the outcome of the trial does not establish prejudice. See id. "Even then, this court retain[s] discretion to deny relief, and denial is particularly warranted where it would not result in a miscarriage of justice." Bennett, 698 F.3d at 200 (alteration in original) (internal quotation marks omitted).

45

At first, the district court refused to permit discussion of the particular email exchange when it was mentioned during the testimony of Rabbitt. Later in the trial, during cross examination of Appellant, the email exchange was admitted over Appellant's relevancy objection. The discussion of the exchange focused on whether Appellant received information about golf courses where he could play for free or at a reduced cost. Upon review of the record, it does not appear that this exchange was mentioned again, and the parties have not identified any other discussion of the exchange.

The use of the email exchange was quite limited, especially in light of the voluminous evidence presented during the course of the five weeks of trial. We cannot say there is a reasonable probability that its admission affected the outcome of the trial. The indictment, we note, did not seek to prosecute Appellant for this conduct; indeed, the district court instructed the jury that Appellant was "not on trial for any act or conduct or offense not alleged in the indictment." J.A. 7695. We presume the jurors followed the district court's instruction. See, e.g., Weeks v. Angelone, 528 U.S. 225, 234 (2000). Accordingly, the claim that evidence of the email exchange affected the outcome of the trial is beyond the realm of reasonable probability. The admission of this evidence was not plainly erroneous.

46

5.

Return of Forensic Image of Williams's iPhone

Appellant also asserts the district court erroneously ordered him to return all copies of a forensic image of Williams's iPhone, which the Government had produced to Appellant pursuant to Rule 16 of the Federal Rules of Criminal Procedure.  Appellant's chief complaint is that the forensic image may contain evidence to which he is entitled pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).

However, Appellant waives this claim because his treatment of it is conclusory.  Appellant merely argues: "If [Appellant] receives a new trial, he is entitled to this evidence, which almost certainly contains Brady and Giglio material.  Likewise, if any of that evidence proves material, its confiscation requires a new trial."  Appellant's Br. 85 (citations omitted).  Appellant's argument includes bare citations to two decisions of little obvious relevance from other courts of appeals.  Furthermore, Appellant does not make any effort to establish the elements of a Brady or Giglio violation.  See Strickler v. Greene, 527 U.S. 263, 281–82 (1999) ("The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

47

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").

Summary treatment of a claim does not sufficiently raise the claim. See, e.g., Russell v. Absolute Collection Servs., Inc., 763 F.3d 385, 396 n.* (4th Cir. 2014) (noting that failure to present legal arguments and "record citations or pertinent legal authority supporting . . . a claim" waives the claim). Although Appellant raised this issue in an interlocutory appeal in a related case -- an appeal we dismissed for want of jurisdiction -- this does not preserve the issue and is not sufficient to raise the issue now. To avoid waiver, a party must brief the issue in an appeal over which we may exercise jurisdiction. Thus, because Appellant fails to sufficiently raise this issue and has, therefore, effectively waived it, we do not further address it.

III.

With these matters resolved, we turn to the two arguments at the core of this appeal. First and foremost, Appellant asserts that the district court's jury instructions misstated fundamental principles of federal bribery law. Second, he asserts that the Government's evidence was insufficient to support his convictions pursuant to the honest-services wire fraud statute and the Hobbs Act. We address each of these contentions in turn.

48

Jury Instructions

Appellant's claim with respect to the jury instructions is that the court defined bribery far too expansively. "We review de novo the claim that a jury instruction failed to correctly state the applicable law." United States v. Jefferson, 674 F.3d 332, 351 (4th Cir. 2012). "[W]e do not view a single instruction in isolation, but instead consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." United States v. Woods, 710 F.3d 195, 207 (4th Cir. 2013) (internal quotation marks omitted). Even if, upon review, we find that the court misinstructed the jury on an element of an offense, we may disregard the error as harmless. See United States v. Cloud, 680 F.3d 396, 408 n.5 (4th Cir. 2012); United States v. Ramos-Cruz, 667 F.3d 487, 496 (4th Cir. 2012). "We find an error in instructing the jury harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'"[15] Ramos-

---

[15] Prior to closing arguments in this case, the trial court conducted a lengthy charge conference, during which Appellant's counsel vigorously challenged many of the Government's proposed instructions, including instructions that the court ultimately gave. The court did not invite the parties to object to the instructions after the court gave them to the jury -- nor did either party request to do so. We remind the district courts (Continued)

<u>Cruz</u>, 667 F.3d at 496 (quoting <u>Neder v. United States</u>, 527 U.S. 1, 18 (1999)).

1.

We begin our analysis with an examination of the statutes of conviction. The first of these is the honest-services wire fraud statute, 18 U.S.C. §§ 1343, 1346.[16] This statute requires the Government to prove that the defendant sought to "carry out a 'scheme or artifice to defraud' another of 'the intangible right of honest services.'" <u>United States v. Terry</u>, 707 F.3d 607, 611 (6th Cir. 2013) (citations omitted) (quoting 18 U.S.C. §§ 1341, 1346). The Supreme Court has

and counsel that the proper time for cementing objections to instructions is after they are given but "before the jury retires to deliberate." Fed. R. Crim. P. 30(d); <u>see</u> <u>United States v. Taglianetti</u>, 456 F.2d 1055, 1056–57 (1st Cir. 1972) (rejecting the "improper practice" of taking objections to the jury charge "in chambers before delivery, rather than afterwards").

[16] The wire fraud statute provides, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 1343. "[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." <u>Id.</u> § 1346.

50

recognized that § 1346 proscribes two, and only two, types of activities: bribery and kickback schemes.  See Skilling v. United States, 130 S. Ct. 2896, 2907 (2010).  To the extent that the statute prohibits acts of bribery, the prohibition "draws content . . . from federal statutes proscribing -- and defining -- similar crimes," including the general federal bribery statute, 18 U.S.C. § 201(b), and the statute prohibiting theft and bribery involving federal funds, 18 U.S.C. § 666(a)(2).  Skilling, 130 S. Ct. at 2933.

Here, in their proposed instructions for honest-services wire fraud, both parties sought to import the definition of bribery set forth in 18 U.S.C. § 201(b)(2).  This statute provides that public officials may not "corruptly" demand, seek, or receive anything of value "in return for . . . being influenced in the performance of any official act."  18 U.S.C. § 201(b)(2).  The statute defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  Id. § 201(a)(3).  The district court provided a near-verbatim recitation of these provisions in its honest-services wire fraud instructions.

51

A second statute of conviction in Appellant's case, the Hobbs Act, prohibits acts of extortion which "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). Though a defendant may commit extortion through threats or violence, it is also possible to commit extortion by obtaining property "under color of official right." Id. § 1951(b)(2). In Evans v. United States, the Supreme Court explained that its construction of § 1951 "is informed by the common-law tradition," under which "[e]xtortion by [a] public official was the rough equivalent of what we would now describe as 'taking a bribe.'" 504 U.S. 255, 260, 268 (1992). Accordingly, we have concluded that prosecutions for extortion under color of official right, like prosecutions under other bribery-related statutes, require proof of a quid pro quo. See United States v. Hairston, 46 F.3d 361, 365 (4th Cir. 1995).

Here, the parties agreed that a charge of extortion under color of official right has four elements. The trial court accordingly instructed the jury that the Government must prove beyond a reasonable doubt that the defendant (1) was a public official; (2) "obtained a thing of value not due him or his [office]"; (3) "did so knowing that the thing of value was given in return for official action"; and (4) "did or attempted

52

in any way or degree to delay, obstruct, or affect interstate commerce, or an item moving in interstate commerce."  J.A. 7681.

2.

Official Acts

Appellant first challenges the district court's instructions on the meaning of "official act," or, alternatively, "official action."  Appellant argues the court's definition was overbroad, to the point that it would seem to encompass virtually any action a public official might take while in office.

In its instructions on honest-services wire fraud, the district court defined "official action":

> The term official action means any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may by law be brought before any public official, in such public official's official capacity. Official action as I just defined it includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law. In other words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description. And a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor.  In addition,

53

official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end.

J.A. 7671-72. The court later explained to the jury that these instructions "apply equally to the definition of official action for the purposes of" the Hobbs Act counts. Id. at 7683.

In broad strokes, Appellant's argument is that the court's definition of "official action" is overinclusive. By his account, the court's instructions would deem virtually all of a public servant's activities "official," no matter how minor or innocuous. For public figures such as a governor, who interact with constituents, donors, and business leaders as a matter of custom and necessity, these activities might include such routine functions as attending a luncheon, arranging a meeting, or posing for a photograph. Appellant argues that activities of this nature can never constitute an official act. See Appellant's Br. 28.

We have recognized that the term "official act" "does not encompass every action taken in one's official capacity." Jefferson, 674 F.3d at 356. Its meaning is more limited than that. We are satisfied, though, that the district court adequately delineated those limits when it informed the jury that the term "official act" covers only "decision[s] or action[s] on any question, matter, cause, suit, proceeding, or

54

controversy, which may at any time be pending, or which may by law be brought before any public official, in such public official's official capacity." J.A. 7671 (paraphrasing 18 U.S.C. § 201(a)(3)).

a.

The Supreme Court has twice expounded on the meaning of "official act." It first did so a little more than a century ago, in United States v. Birdsall, 233 U.S. 223 (1914). There, two federal officers responsible for suppressing liquor traffic in Indian communities challenged their indictments for accepting bribes in violation of section 117 of the Criminal Code, the predecessor statute to 18 U.S.C. § 201(b).[17]  See Birdsall, 233

---

[17] Section 117 provided:

> Whoever, being an officer of the United States, or a person acting for or on behalf of the United States, in any official capacity, under or by virtue of the authority of any department or office of the Government thereof[,] . . . shall ask, accept, or receive any money, . . . with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby, shall be [penalized by fine, imprisonment, and disqualification from office].

Act of March 4, 1909, ch. 321, § 117, 35 Stat. 1088, 1109-10. We have observed that "there is simply no distinction in substance between an official act as defined by Birdsall" and an
(Continued)

55

U.S. at 227. The indictments alleged that attorney Birdsall bribed the officers to advise the Commissioner of Indian Affairs to recommend leniency for individuals convicted of liquor trafficking offenses involving Indians. See id. at 229-30. The district court sustained the officers' demurrers, holding that their actions were not within the scope of the bribery statute because "there [was] no act of Congress conferring upon the Interior Department, or the Bureau of Indian Affairs, any duty whatever in regard to recommending to the executive or judicial departments of the government whether or not executive or judicial clemency shall be extended." United States v. Birdsall, 206 F. 818, 821 (N.D. Iowa 1913), rev'd, 233 U.S. 223 (1914). The Supreme Court, however, reversed. In doing so, it declared that an action may be "official" for purposes of a bribery charge even if it is not prescribed by statute, written rule, or regulation. See Birdsall, 233 U.S. at 230-31. Indeed, as the Court explained, an official act:

> might also be found in an established usage which constituted the common law of the department and fixed the duties of those engaged in its activities. In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the

---

"official act" under the current bribery statute, 18 U.S.C. § 201(a)(3). Jefferson, 674 F.3d at 353.

> course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery.

Id. at 231 (citation omitted).

Birdsall continues to stand for the proposition that an "official act" "may include acts that a [public servant] customarily performs, even if the act falls outside the formal legislative process."  Jefferson, 674 F.3d at 357; see also United States v. Morlang, 531 F.2d 183, 192 (4th Cir. 1975). Importantly, though, Birdsall did not rule, and we have never held, that every act an official performs as a matter of custom is an "official act."  To constitute an "official act" under federal bribery law, a settled practice "must yet adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding or controversy.'"  Jefferson, 674 F.3d at 356 (quoting 18 U.S.C. § 201(a)(3)).

By way of dicta in United States v. Sun-Diamond Growers of California, 526 U.S. 398 (1999), the Supreme Court has clarified this point.  Sun-Diamond, it must be noted, was not a bribery case.  Its focus, rather, was the federal gratuity statute, 18 U.S.C. § 201(c), which criminalizes gifts given to a public official "for or because of any official act."  18 U.S.C. § 201(c)(1)(A).  Notably, though, the definition of an "official act" supplied in § 201(a)(3) applies to the entirety of § 201, including the dual prohibitions on bribery and illegal

57

gratuities.  See 18 U.S.C. § 201(a) (providing a definition of "official act" "[f]or the purpose of this section").

The Sun-Diamond Court explained that the illegal gratuity statute requires the Government to demonstrate a link between the gift and "some particular official act of whatever identity."  526 U.S. at 406 (internal quotation marks omitted). In the course of its explanation, the Court stated that an alternative reading would criminalize, for example, "token gifts to the President based on his official position and not linked to any identifiable act -- such as the replica jerseys given by championship sports teams each year during ceremonial White House visits"; "a high school principal's gift of a school baseball cap to the Secretary of Education, by reason of his office, on the occasion of the latter's visit to the school"; or a "complimentary lunch" provided for the Secretary of Agriculture "in connection with his speech to the farmers concerning various matters of USDA policy."  Id. at 406-07.  The Court proceeded to explain why it would not do to argue that these three acts -- that is, receiving the sports teams, visiting the high school, or speaking to farmers -- were "official acts" in their own right:

> The answer to this objection is that those actions -- while they are assuredly "official acts" in some sense -- are not "official acts" within the meaning of the statute, which, as we have noted, defines

58

> "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). Thus, when the violation is linked to a particular "official act," it is possible to eliminate the absurdities through the definition of that term.

Id. at 407-08 (emphasis omitted).

We have previously declined to read Sun-Diamond to exclude "all settled practices by a public official from the bribery statute's definition of an official act." Jefferson, 674 F.3d at 356 (emphasis supplied). Appellant concedes the point, acknowledging that "some settled practices can be official acts." Appellant's Br. 37 (emphasis omitted). He argues, though, that under the logic of Sun-Diamond, the kinds of activities he is accused of -- e.g., speaking with aides and arranging meetings -- can never constitute "official acts" because they "implicate no official power."[18] Id. at 31 (emphasis omitted). Appellant simply misreads Sun-Diamond.

---

[18] In further support of his argument that an "official act" necessitates a deployment of "official powers," Appellant calls our attention to the First Circuit's decision in United States v. Urciuoli, 513 F.3d 290 (1st Cir. 2008). The appellants in Urciuoli were hospital executives who allegedly employed a state senator in a "sham job" in exchange for various efforts to advance the hospital's financial interests. 513 F.3d at 292. In pertinent part, the Government alleged that the senator (Continued)

The <u>Sun-Diamond</u> Court did not rule that receptions, public appearances, and speeches can never constitute "official acts" within the meaning of § 201(a)(3); the Court's point was that job functions of a strictly ceremonial or educational nature will rarely, if ever, fall within this definition. The reason is not that these functions cannot <u>relate</u>, in some way,

---

lobbied municipal officials to comply with Rhode Island law governing ambulance runs. <u>See</u> <u>id.</u> As a result of this act, among various other actions, the executives were convicted of honest-services mail fraud pursuant to 18 U.S.C. §§ 1341 and 1346. <u>See</u> <u>id.</u> at 293.

There, as in this case, the chief issue on appeal was whether the court's instructions were overbroad. It must be noted, though, that the instructions in that case were decidedly different than the instructions here. Instead of borrowing the bribery definition from § 201(a)(3), as the court here did, the trial court in <u>Urciuoli</u> instructed the jury to decide whether the object of the scheme was a deprivation of "honest services," defined as follows:

> The honest services that an elected official owes to citizens is not limited to the official's formal votes on legislation. It includes the official's behind-the-scenes activities and influence in the legislation, and it also includes other actions that the official takes in an official capacity, not what he does as a private individual but what he does under the cloak of his office.

<u>Urciuoli</u>, 513 F.3d at 295 n.2 (internal quotation marks omitted). The First Circuit ruled that the phrase "under the cloak of his office" was overbroad under the circumstances because lobbying mayors <u>to obey state law</u> cannot constitute a deprivation of honest services. <u>See</u> <u>id.</u> at 295. While Appellant reads <u>Urciuoli</u> to proclaim that acts like lobbying can never be official acts, the First Circuit made no such pronouncement.

60

to a "question, matter, cause, suit, proceeding or controversy." 18 U.S.C. § 201(a)(3). Frequently, they will. When, as in the Court's example, the Secretary of Education visits a local high school, he may proceed to discuss matters of education policy with the student body. Surely, though, this discussion does not have the purpose or effect of exerting some influence on those policies. Its function, rather, is to educate an audience of students. Under these circumstances, it cannot be said that the Secretary's visit is a "'decision or action on'" the question, matter, cause, suit, proceeding, or controversy. Sun-Diamond, 526 U.S. at 407 (emphasis supplied) (quoting 18 U.S.C. § 201(a)(3)).

In view of these precedents, we are satisfied that the reach of § 201(a)(3) is broad enough to encompass the customary and settled practices of an office, but only insofar as a purpose or effect of those practices is to influence a "question, matter, cause, suit, proceeding or controversy" that may be brought before the government. 18 U.S.C. § 201(a)(3). It is with this principle in mind that we assess Appellant's contentions about the jury instructions in this case.[19]

---

[19] Appellant invokes a number of canons of statutory interpretation that favor a narrow construction of "official act." As for his argument that the bribery laws should be void for vagueness, the Supreme Court has already rejected a challenge that the honest-services statute is unconstitutionally
(Continued)

61

b.

Appellant accuses the district court of giving the jury an "unprecedented and misleading" instruction on the "official act" element. Appellant's Br. 51. We disagree with these characterizations. First, the court's instruction was not unprecedented. To a large extent, the instruction echoed the "official act" instruction in United States v. Jefferson.[20] Second, the instruction here was not misleading. The court correctly stated, consistent with Birdsall, that the term "official action" "includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law." J.A. 7671-72.

---

vague as applied to bribery. See Skilling, 130 S. Ct. at 2928. And because Appellant has "engage[d] in some conduct that is clearly proscribed" by the Hobbs Act, he "cannot complain of the vagueness of the law as applied to the conduct of others." Holder v. Humanitarian Law Project, 561 U.S. 1, 18-19 (2010) (internal quotation marks omitted). Appellant's remaining narrowing arguments -- which invoke federalism concerns, the rule of lenity, and dicta in Sun-Diamond -- all presuppose inherent ambiguity in the statutory term "official act." However, as we have explained, the term is sufficiently definite as to make recourse to those canons unnecessary.

[20] In Jefferson, we held that the following jury instruction was not erroneous: "An act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather, official acts include those activities that have been clearly established by settled practice as part of a public official's position." 674 F.3d at 353 (alteration omitted).

62

The court then explained that the meaning of "official action" is tethered to decisions or actions on a "question, matter, cause, suit, proceeding, or controversy" that may come before the government. See id. at 7671.

i.

Appellant takes issue with the court's instruction that an official action "'can include actions taken in furtherance of longer-term goals.'" Appellant's Br. 56 (quoting J.A. 7672). He argues that this instruction is too sweeping, as "virtually anything could be in 'furtherance' of some goal." Id. For similar reasons, Appellant challenges the court's instruction that "'an official action is no less official because it is one in a series of steps to exercise influence or achieve an end.'" Id. (emphasis omitted) (quoting J.A. 7672). We find no error in either of the court's statements.

We observe, first, that the federal bribery statute, 18 U.S.C. § 201(b), from which the honest-services wire fraud statute draws meaning, criminalizes the act of "corruptly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept" a thing of value in return for influence. 18 U.S.C. § 201(b)(2). The solicitation or acceptance of the bribe completes the crime, regardless of whether the recipient completes, or even commences, the "official act" the bribe payor sought to influence. See Howard v. United States, 345 F.2d 126,

63

128 (1st Cir. 1965) ("[I]t has been long established that the crime of bribery is complete upon the acceptance of a bribe regardless of whether or not improper action is thereafter taken."). The same is true of a Hobbs Act extortion charge. See Evans, 504 U.S. at 268 (recognizing that the crime of extortion under color of official right is "completed at the time when the public official receives a payment in return for his agreement to perform specific official acts"); United States v. Loftus, 992 F.2d 793, 797 (8th Cir. 1993). In either case, when prosecuting a bribe recipient, the Government need only prove that he or she solicited or accepted the bribe in return for performing, or being influenced in, some particular official act. Of importance, the consummation of an "official act" is "not an element of the offense." Evans, 504 U.S. at 268.

We further observe that an "official act" may pertain to matters outside of the bribe recipient's control. See 18 U.S.C. § 201(a)(3) (providing that an act may be "official" so long as the matter to be decided or acted upon "may by law be brought before any public official" (emphasis supplied)). Indeed, in Birdsall, the defendant-officers lacked any authority to grant clemency; all they could provide was advice. 233 U.S. at 229-30. Nevertheless, the Supreme Court upheld their bribery indictments. See id. at 236. Likewise, in Sears v. United States, the First Circuit recognized that government inspectors

64

were performing an "official" function, for purposes of two shoemakers' federal bribery charges, when they accepted payoffs to disregard inadequacies in leather shoes destined for sale to the Army. 264 F. 257, 261-62 (1st Cir. 1920). As the court stated:

> The fact that these inspectors acted only in a preliminary or in an advisory capacity, and without final power to reject or accept, does not prevent their duties from being official duties. Final decisions frequently, perhaps generally, rest in large part upon the honesty and efficiency of preliminary advice. . . . To sustain the contention of the defendants that these inspectors were not performing an official function would be to rule that the thousands of inspectors employed to advise and assist the government under the contracts for the hundreds of millions of war supplies might be bribed with impunity. To state the proposition is to reject it.

Id.

Our decision in Jefferson supports the proposition that mere steps in furtherance of a final action or decision may constitute an "official act." The defendant in that case was a former Louisiana congressman who, as co-chair of the Africa Trade and Investment Caucus and the Congressional Caucus on Nigeria, was "largely responsible for promoting trade" with Africa. 674 F.3d at 357. A jury convicted Jefferson of both bribery and honest-services wire fraud, based in part on allegations that he asked a telecommunications company to hire

65

his family's consulting firm in return for his efforts to promote the company's technology in Africa. See id. at 338. Jefferson's efforts on the company's behalf involved a series of trips and meetings. In particular, we explained, "acts performed by Jefferson in exchange for the various bribe payments included, inter alia": "corresponding and visiting with foreign officials"; "[a]ttempting to facilitate and promote" certain business ventures; "[s]cheduling and conducting meetings"; and "seeking to secure construction contracts." Id. at 356. We were satisfied that these activities were in keeping with Jefferson's settled practice of serving constituents and promoting trade in Africa and that, accordingly, the jury was "entitled to conclude" that his actions "fall under the umbrella of his 'official acts.'" Id. at 357-58.

ii.

Appellant next challenges the district court's instruction that a public official "need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor." J.A. 7672. Appellant argues that this is a misstatement of law: a bribe payor's subjective belief cannot convert a non-official act into an

official one.  See Appellant's Br. 55.  Again, we are unpersuaded.

The first part of the court's instruction is indisputably correct.[21]  In Wilson v. United States, we held that a bribery conviction will stand regardless of whether the bribe recipient "had actual authority to carry out his commitments under the bribery scheme."  230 F.2d 521, 526 (4th Cir. 1956).  There, a jury convicted an adjutant general of soliciting bribes from an insurance salesman in exchange for the right to sell insurance at Fort Jackson -- even though the solicitations occurred while the adjutant general was temporarily relieved of his post.[22]  See id. at 523.  We deemed the adjutant general's lack of actual authority "immaterial":  "Regardless of his actual authority, it was still within his practical power to influence the regulation of insurance sales as it had formerly

---

[21] Appellant's own proposed jury instructions concede the point, stating that a public official "can perform an 'official act' when it is a settled practice as part of the official's position for him to exercise influence over a government decision even if he does not have authority to make the final decision himself."  J.A. 753.

[22] The statute of conviction in Wilson was 18 U.S.C. § 202, which authorized penalties for any federal officer or employee who "asks [for], accepts, or receives" a thing of value "with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby."  18 U.S.C. § 202 (1952) (current version at 18 U.S.C. § 201(b) (2012)).

been . . . ." Id. at 526; cf. United States v. Ring, 706 F.3d 460, 470 (D.C. Cir. 2013) (holding that a Department of Justice attorney committed an "official act" pursuant to § 201(c) when he forwarded an email to another government official in an effort to expedite a foreign student's visa application, even though the attorney "lacked independent authority to expedite visa applications").

As to the second part of the court's instruction, we have no difficulty recognizing that proof of a bribe payor's subjective belief in the recipient's power or influence over a matter will support a conviction for extortion under color of official right. See United States v. Bencivengo, 749 F.3d 205, 212-13 (3d Cir. 2014); United States v. Blackwood, 768 F.2d 131, 134-35 (7th Cir. 1985); United States v. Bibby, 752 F.2d 1116 (6th Cir. 1985); United States v. Rabbitt, 583 F.2d 1014, 1027 (8th Cir. 1978) ("The official need not control the function in question if the extorted party possesses a reasonable belief in the official's powers."). As the First Circuit explained in United States v. Hathaway, the phrase "under color of official right" "includes the misuse of office to induce payments not due." 534 F.2d 386, 394 (1st Cir. 1976). Accordingly, the "relevant question" when contemplating a prosecution under this statute is simply whether the government official "imparted and

68

exploited a reasonable belief that he had effective influence over" the subject of the bribe. Id.

Plainly, Hobbs Act principles support the district court's instruction that a bribe recipient's lack of actual authority over a matter does not preclude "official act" status, "so long as the alleged bribe payor reasonably believes" that the recipient had "influence, power or authority over a means to the end sought." J.A. 7672. We are satisfied, therefore, that this instruction was not erroneous with respect to the Hobbs Act extortion charges.

It is less certain that a bribe payor's subjective belief in the recipient's power or influence will suffice to demonstrate an "official act" for purposes of an honest-services wire fraud charge. The "intangible right of honest services," after all, is a right held by the public. See United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008). When a government official agrees to influence a matter in exchange for money, that official deprives the public of his "honest, faithful, and disinterested services." Id. (internal quotation marks omitted). The third party who pays the government official may be a constituent of the official, but he is no victim, and the honest-services wire fraud statute does not seek to protect him.

Appellant's argument, therefore, that the subjective beliefs of a third party in an honest-services wire fraud case

69

cannot "convert non-official acts into official ones" is debatable. Appellant's Br. 55 (emphasis omitted). This, however, is not an issue that we need to decide. Even if the court's instruction on this point were erroneous, the error would be harmless. See Ramos-Cruz, 667 F.3d at 496. As Governor of Virginia, Appellant most certainly had power and influence over the results Williams was seeking. We have no doubt that the jury's verdict on the honest-services wire fraud charge would have been the same even if the instructions required a finding that Appellant had the power to influence a means to the end being sought.

Appellant has thus failed to show that the court's "official act" instructions, taken as a whole, were anything less than a "fair and accurate statement of law." United States v. Smoot, 690 F.3d 215, 223 (4th Cir. 2012). Appellant's claim of reversible error with respect to the "official act" instructions is therefore rejected.

c.

We likewise reject Appellant's argument that the court erred in refusing to give his proposed instructions on the meaning of "official act." We review a district court's refusal to give a specific jury instruction for abuse of discretion, "and reverse only when the rejected instruction (1) was correct; (2) was not substantially covered by the court's charge to the

70

jury; and (3) dealt with some point in the trial so important . . . that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Smith, 701 F.3d 1002, 1011 (4th Cir. 2012) (internal quotation marks omitted).

Appellant's proposed instruction contained the following passage:

> [T]he fact that an activity is a routine activity, or a "settled practice," of an office-holder does not alone make it an "official act." Many settled practices of government officials are not official acts within the meaning of the statute. For example, merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, "official acts," even if they are settled practices of the official. A government official's decisions on who[m] to invite to lunch, whether to attend an event, or whether to attend a meeting or respond to a phone call are not decisions on matters pending before the government. That is because mere ingratiation and access are not corruption.

J.A. 753.

This passage is problematic in a number of ways. First, it is hardly evident that "[m]any" settled practices do not qualify as "official acts." J.A. 753. Even if this were so, it is not a statement of law. Rather, it seems to us a thinly veiled attempt to argue the defense's case. Given the

71

risk of misleading the jury, we cannot fault the court for declining to give this instruction.

The court was likewise justified in rejecting Appellant's assertion that "merely arranging a meeting, attending an event, hosting a reception, or making a speech" cannot constitute an "official act." As detailed above, neither Sun-Diamond nor any other precedent sweeps so broadly.

Moving on, Appellant has also failed to explain why the court should have instructed the jury that "decisions on who[m] to invite to lunch, whether to attend an event, or whether to attend a meeting or respond to a phone call are not decisions on matters pending before the government." J.A. 753. Even if we assume that most such decisions would not qualify as official acts, we cannot accept the assertion that they may never do so. Here, again, the proposed instruction goes too far.

Finally, we hold that the court did not err in refusing to instruct the jury, in language borrowed from Citizens United v. Federal Election Commission, 558 U.S. 310, 361 (2010), that "mere ingratiation and access are not corruption." J.A. 753. Affording the talismanic significance Appellant assigns to this language ignores its context; Citizens United, a campaign-finance case, involved neither the honest-services statute nor the Hobbs Act. Moreover, the Citizens

72

United Court employed the "ingratiation" language only after providing a much broader definition of corruption: "The hallmark of corruption is the financial quid pro quo: dollars for political favors." Citizens United, 558 U.S. at 359 (internal quotation marks omitted). In the case at hand, this broader definition was "substantially covered by the court's charge to the jury." Smith, 701 F.3d at 1011 (internal quotation marks omitted). Thus, the court's failure to include this language did not "impair[]" Appellant's "ability to conduct his defense." Id. (internal quotation marks omitted). The district court instructed the jury that "there would be no crime" as long as Appellant "believed in good faith that he . . . was acting properly, even if he . . . was mistaken in that belief." J.A. 7692. Appellant was thus free to argue that he believed in good faith that any ingratiation or access he provided Williams was entirely proper. If the jury believed that, it would have had no choice but to acquit him.

Taken as a whole, Appellant's proposed instruction on the meaning of "official act" failed to present the district court with a correct statement of law. He cannot now argue that the court's refusal to give that instruction was an abuse of discretion.

3.

## Quid Pro Quo

Appellant also contests the court's instructions on the "quid pro quo" elements of honest-services wire fraud and Hobbs Act extortion, maintaining that the court's gloss on this term would criminalize the lawful receipt of "goodwill" gifts to lawmakers.

In this context, the term "quid pro quo" refers to "an intent on the part of the public official to perform acts on his payor's behalf." Jefferson, 674 F.3d at 358; see also Sun-Diamond, 526 U.S. at 404-05 (defining "quid pro quo as "a specific intent to give or receive something of value in exchange for an official act" (emphasis omitted)). Accordingly, in its instructions on the honest-services wire fraud charge, the district court explained that the jury must find that Appellant demanded or received the item of value "corruptly" -- i.e., with an "improper motive or purpose." J.A. 7669-70; see United States v. Quinn, 359 F.3d 666, 674 (4th Cir. 2004) (defining "[c]orrupt intent" under 18 U.S.C. § 201(b)). Likewise, in its Hobbs Act instruction, the court stated that Appellant must have "obtained a thing of value to which he was not entitled, knowing that the thing of value was given in return for official action." J.A. 7682; see Evans, 504 U.S. at 268.

74

Appellant's contention is not that the court's instructions were incorrect but, rather, that they were incomplete. In particular, Appellant asserts that the court failed to make the jury aware of a critical limitation on bribery liability when it neglected to state, per his proposed instructions, that "[a] gift or payment given with the generalized hope of some unspecified future benefit is not a bribe." J.A. 751; accord id. at 756. Appellant claims that this omission seriously impaired his defense because "a central defense theory was that Governor McDonnell believed Williams was simply trying to cultivate goodwill." Appellant's Br. 59-60.

Appellant's statement of the law is correct, so far as it goes. See United States v. Jennings, 160 F.3d 1006, 1013 (4th Cir. 1998). "It is universally recognized that bribery occurs only if the gift is coupled with a particular criminal intent. That intent is not supplied merely by the fact that the gift was motivated by some generalized hope or expectation of ultimate benefit on the part of the donor." United States v. Arthur, 544 F.2d 730, 734 (4th Cir. 1976) (citations omitted) (reversing a conviction for misapplication of bank funds pursuant to 18 U.S.C. § 656). The bribe payor must have more than a "'[v]ague expectation[]'" that the public official will reward his kindness, somehow or other. Jennings, 160 F.3d at 1013 (quoting United States v. Allen, 10 F.3d 405, 411 (7th Cir.

75

1993)).  He must harbor an intent to secure a "specific type of official action or favor in return" for his largesse.  Id. at 1014 (emphasis omitted).

The Government never disputed these points.  Indeed, there is little reason to doubt that if the defense had submitted a written instruction relating to goodwill gifts, the court would have accepted it.  However, the defense did no such thing.  Instead, its proposed "goodwill gift" language was tucked into the penultimate sentence of the defense's proposed instructions on the definition of "corruptly," see J.A. 751, 756, a term the court took care to explicate, see id. at 7670 (explaining that bribery requires a corrupt intent -- meaning, here, that the public official must demand, seek, or receive the item of value "knowingly and dishonestly for a wrongful purpose").  As outlined above, the court emphasized the essentiality of the prosecution's burden to prove corrupt intent when it instructed the jury on Appellant's "good faith" defense. See J.A. 7692 (charging the jury that "if a defendant believed in good faith that he or she was acting properly, even if he or she was mistaken in that belief, and even if others were injured by his or her conduct, there would be no crime").  Appellant was adamant, during the trial conference, about the importance of his "good faith" defense in this case, referring to it as "our critical defense."  Id. at 7360.

It is not enough, in any event, for Appellant to show that his proposed instructions contained a correct statement of law. If, as it happens, the rejected instruction was "substantially covered by the court's charge to the jury," there is no reversible error. United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009) (internal quotation marks omitted). Put succinctly, we are satisfied that the court's "quid pro quo" instructions were adequate. In its Hobbs Act instruction, the court made clear that extortion under color of official right requires an intent to have the public official "take specific official action on the payor's behalf." J.A. 7682-83 (emphasis supplied). Similarly, in its instruction on honest-services wire fraud, the court referred to the "quo" in a quid pro quo exchange as "the requested official action" -- signaling that an official action necessarily entails some particular type of act within the parties' contemplation at the time of the exchange. Id. at 7669.

In sum, we are satisfied that the court properly instructed the jury on the "quid pro quo" requirement of the charged offenses. Accordingly, we reject Appellant's claim of instructional error in that respect.

77

B.

Sufficiency of the Evidence

This leads us to Appellant's claim that the Government's evidence was insufficient to support the convictions. "We review a challenge to the sufficiency of the evidence de novo . . . ." United States v. Bran, 776 F.3d 276, 279 (4th Cir. 2015). If, viewing the evidence in the light most favorable to the Government, we find there is substantial evidence to support the conviction, we will affirm the jury verdict. See United States v. Hager, 721 F.3d 167, 179 (4th Cir. 2013). "Substantial evidence is such evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (internal quotation marks omitted).

To review, the Government set out to prove that Williams and Appellant engaged in a corrupt quid pro quo. Williams, we know, supplied the "quid," and plenty of it. Among other things, he provided Appellant's family -- generally at the behest of Appellant or Mrs. McDonnell -- with multiple five-figure payments and loans, expensive getaways, shopping trips, golf outings, and a Rolex watch. The greater challenge for the Government was persuading the jury that Williams's payments to Appellant and his family were "pro quo." In short, the Government was obligated to prove, first, that Williams's

78

payments came with a corrupt understanding and, second, that the key to that understanding was the expectation that Appellant would perform certain official acts for Williams's benefit.

1.

Evidence of Official Acts

In the first place, we reject Appellant's contention that the Government's evidence cannot satisfy the "official act" requirement.

An "official act," as defined by statute, requires the existence of some "question, matter, cause, suit, proceeding or controversy." 18 U.S.C. § 201(a)(3). Here, the Government presented evidence of three questions or matters within Appellant's sphere of influence. The first of these was whether researchers at any of Virginia's state universities would initiate a study of Anatabloc. The second was whether the state-created Tobacco Indemnification and Community Revitalization Commission ("Tobacco Commission") would allocate grant money for the study of anatabine. The third was whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug.

These were all government matters, and Appellant, as head of the Commonwealth's government, was in a prime position to affect their disposition. The Constitution of Virginia vests the Governor with "[t]he chief executive power of the

79

Commonwealth." Va. Const. art. V., § 1. State law provides that the Governor "shall have the authority and responsibility for the formulation and administration of the policies of the executive branch." Va. Code Ann. § 2.2-103.A. These powers include the authority to approve the health insurance plans provided to public-sector employees at the state and local level. See id. §§ 2.2-1204.A, -2818.A. In addition, among his myriad other powers, the Governor appoints 12 of the 13 members of the State Council of Higher Education for Virginia, see id. § 23-9.3.C.; all members serving on the boards of visitors of Virginia Commonwealth University and the University of Virginia, see id. §§ 23-50.6(a), -70.A; and a majority of commissioners on the Tobacco Commission, see id. § 3.2-3102.A.

With power comes influence. As the witness Jerry Kilgore, Star's lawyer, put it: "[T]he Governor is the Chief Executive of the Commonwealth. He has this bully pulpit, if you will, to go out and talk about issues." J.A. 4374. The evidence at trial made clear that Star executives wanted Appellant to use his prominence and influence to the company's advantage. See e.g., id. at 3898 (former Star President Perito testifying that when "the Chief Executive of the Commonwealth . . . embraces the worthiness of the product[,] . . . [i]t gives it a type of credibility"); see also id. at 2314 (Williams testifying that the opportunity to

80

"showcase" a product at the Governor's Mansion "automatically" imbues the product with "credibility").

To the extent, then, that Appellant made any "decision" or took any "action" on these matters, the federal bribery laws would hold that decision or action to be "official." 18 U.S.C. § 201(a)(3). As we have explained, it was not necessary for the Government to prove that Appellant actually took any such official action. What the Government had to show was that the allegedly corrupt agreement between Appellant and Williams carried with it an expectation that some type of official action would be taken. See United States v. Giles, 246 F.3d 966, 973 (7th Cir. 2001). Here, the Government exceeded its burden. It showed that Appellant did, in fact, use the power of his office to influence governmental decisions on each of the three questions and matters discussed above.

First, in August 2011, Appellant asked his Secretary of Health, Dr. Hazel, to send a deputy to a "short briefing" with Mrs. McDonnell at the Governor's mansion. In his email to Hazel, Appellant made clear that the subject of the briefing would be "the Star Scientific anatablock trials planned in va at vcu and uva." G.S.A. 80. Naturally, the staff complied. As one staffer, Molly Huffstetler, wrote in an email to her colleagues: "[W]e will do what we can to carry out the desires of the Governor and First Lady." Id. at 81.

81

That same month, Appellant and his wife hosted a product launch for Anatabloc at the Governor's Mansion. Prior to the event, Mrs. McDonnell explained to a staff member that one of the purposes of the event was to "encourag[e] universities to do research on the product." J.A. 3608. Invitees included Dr. Clore, an associate vice president for clinical research at VCU, and Dr. Lazo, former associate dean for basic research at the UVA School of Medicine. Appellant spoke with Lazo, asking him and other attendees whether they thought "there was some scientific validity" to the pre-clinical studies of Anatabloc presented at the event and "whether or not there was any reason to explore this further; would it help to have additional information." J.A. 3344. Appellant also asked whether the development of Anatabloc could "be something good for the Commonwealth, particularly as it relates to [the] economy or job creation." Id.

A series of emails exchanged in February 2012 between Appellant, his wife, and chief counsel Eige shows Appellant continuing to push for state university research on Anatabloc. In a February 17 email, Appellant told Eige: "Pls see me about anatabloc issues at VCU and UVA. Thx." G.S.A. 157. Eige would later express his discomfort with Appellant's involvement in the issue, telling Kilgore: "I've been asked by the Governor to call and put -- you know, show support for this research, and I'm

82

just -- I just don't think we should be doing it." J.A. 4374 (internal quotation marks omitted).

Just a week before Appellant's email to Eige, Mrs. McDonnell sent a series of emails of her own asking Eige to get in touch with Williams. The first email bore the subject line: "FW: Anatabine clinical studies – UVA, VCU, JHU." This email said that Williams "has calls in to VCU & UVA & no one will return his calls." G.S.A. 147. The next day, while sitting right next to Appellant, Mrs. McDonnell emailed Eige again:

> Pls call Jonnie today [and] get him to fill u in on where this is at. Gov wants to know why nothing has developed w studies after Jonnie gave $200,000. . . . Gov wants to get this going w VCU MCV. Pls let us know what u find out after we return.

Id. at 154. The email included Williams's cell phone number. Eige later testified that he understood the emails to mean that Mrs. McDonnell wanted him to "[s]omehow reach out and see . . . if we couldn't elicit some type of response from these two universities." J.A. 3214.

Appellant argues that these actions -- asking a staffer to attend a briefing, questioning a university researcher at a product launch, and directing a policy advisor to "see" him about an issue -- are too insignificant to constitute official acts. We disagree. With each of these acts, Appellant exploited the power of his office in furtherance

83

of an ongoing effort to influence the work of state university researchers. Accordingly, a reasonable juror could find, beyond a reasonable doubt, that the actions contemplated under Appellant's agreement with Williams were "official" in nature.

A jury could likewise conclude that Appellant performed an "official" act when he discussed Anatabloc at the March 2012 meeting with two high-ranking administration officials: Secretary of Administration Hicks-Thomas and Department of Human Resource Management Director Sara Wilson. There, amid a discussion about the state employee health insurance plan, Appellant pulled a bottle of Anatabloc from his pocket and showed the pills to Hicks-Thomas and Wilson. As Hicks-Thomas recalled, Appellant "said that he had been taking [the pills] and that they were working well for him, and that he thought it would be good for . . . state employees." J.A. 4227. Appellant then asked Hicks-Thomas and Wilson if they would be willing to meet with Star. Here, again, the evidence suggests that Appellant used his position as Governor to influence a matter of importance to Virginia. This evidence was more than sufficient to support the jury's verdict.

2.

Evidence of a Quid Pro Quo

Next we turn to whether the Government presented evidence sufficient to support a conclusion that there was a

84

corrupt quid pro quo, "a specific intent to give or receive something of value in exchange for an official act." Sun-Diamond, 526 U.S. at 404–05 (emphasis omitted). To establish the necessary intent, the Government had to present evidence of "an exchange of money (or gifts) for specific official action." Jennings, 160 F.3d at 1014. Direct proof of a corrupt intent is not necessary, and "[s]uch an intent may be established by circumstantial evidence." Id.

At trial, the Government presented an array of evidence to show Appellant's corrupt intent. Critically, the Government's evidence demonstrated a close relationship between Appellant's official acts and the money, loans, gifts, and favors provided by Williams to Appellant and Mrs. McDonnell. With respect to the official acts alleged by the Government, a "quo" came on the heels of each "quid." For example:

- Between July 28 and July 31, 2011, Williams provided lodging, transportation, and a boat for the McDonnells' Smith Mountain Lake vacation. Upon returning home on July 31 -- after a three-hour trip home in Williams's Ferrari -- Appellant directed Hazel to send a deputy to meet with Mrs. McDonnell about Anatabloc. On August 1, Huffstetler, Williams, and Mrs. McDonnell met at the Governor's Mansion to discuss Anatabloc clinical trials at UVA and VCU.

- Later that month, on August 31, 2011, McDonnell hosted the launch of Anatabloc at the Governor's Mansion. State employees arranged the event, and

85

invitations to the launch bore the Governor's seal. UVA and VCU researchers attended as invited representatives of their institutions, boxes of Anatabloc were placed at each place setting, and Williams and Mrs. McDonnell spoke at the event.

- Between February and March 2012, Appellant and Williams had a series of discussions regarding a $50,000 so-called loan. On February 16, Appellant checked in with Williams about documents relating to the monies. Six minutes later, Appellant emailed Eige, asking Eige to see him about the Anatabloc studies.

- During these payment negotiations, Mrs. McDonnell and Appellant encouraged Williams to "invite all the doctors that [he] want[ed] to invite" to the healthcare industry leaders reception held at the Governor's Mansion on February 29. J.A. 2312. The list of invitees for the event was revised to include Williams's guests at the direction of Appellant and Mrs. McDonnell.

- On the day of the healthcare leaders event, Appellant met with Williams about a loan of Star Scientific shares worth $187,000. J.A. 6767-72. Less than five hours later, Appellant saw Williams at the event. Appellant's briefing materials for the evening specifically identified the "[p]ersonal doctors of McDonnells," which included Williams's guests, doctors affiliated with Anatabloc. J.A. 6775. Following the event, Williams took Appellant, Mrs. McDonnell, and two of these doctors out to dinner.

- On March 6, 2012, as a result of the negotiations, Williams wrote a $50,000 check to Mobo. Then, on March 21, Appellant met with Hicks-Thomas to discuss covering Anatabloc under the state health

86

plan. Appellant also asked Hicks-Thomas to meet with Star representatives.

The temporal relationship between the "quids" and "quos" -- the gifts, payments, loans, and favors and the official acts -- constitute compelling evidence of corrupt intent.

Throughout the two years during which Appellant was performing the official acts alleged, Williams lavished Appellant with shopping sprees, money, loans, golf outings, and vacations:

- In April 2011, Mrs. McDonnell contacted Williams about a political rally and shopping in New York. On April 13, Williams spent approximately $20,000 on Mrs. McDonnell's New York City shopping spree. That evening, Williams sat next to Appellant and his wife during the political rally.

- In May 2011, Williams loaned the McDonnells $50,000 and provided $15,000 to cover the McDonnells' daughter's wedding reception. When she requested the loan, Mrs. McDonnell said, "The Governor says it's okay for me to help you and -- but I need you to help me." J.A. 2231 (internal quotation marks omitted). In the meantime, Appellant passed an article about Anatabloc along to members of his administration.

- On May 29, 2011, Williams paid $2,380.24 for Appellant and his sons to enjoy golf and amenities at Kinloch Golf Club.

- On January 7, Williams paid $1,368.91 for another of Appellant's golf outings.

87

- During the 2012 Memorial Day weekend, Williams footed the bill for the McDonnells' vacation, spending more than $7,300.

None of these payments were goodwill gifts from one friend to another. Indeed, Appellant and Williams did not know each other until after Appellant was elected Governor. As Williams testified with regard to the money he provided, "I was loaning [Appellant] money so that he would help our company." Id. at 2360. He expected Appellant "to help me move this product forward in Virginia" by "assisting with the universities, with the testing, or help with government employees, or publicly supporting the product." Id. at 2355. And since at least their shared cross-country flight in October 2010, Appellant knew what Williams wanted for his company: independent studies of Anatabloc conducted by Virginia universities.

This evidence established that Appellant received money, loans, favors, and gifts from Williams in exchange for official acts to help Williams secure independent testing of Anatabloc. In light of the foregoing, the jury could readily infer that there were multiple quid pro quo payments, and that Appellant acted in the absence of good faith and with the necessary corrupt intent. See United States v. Hamilton, 701

88

F.3d 404, 409 (4th Cir. 2012) ("[I]ntent can be implied -- and it is the jury's role to make such factual inferences.").[23]

In sum, Appellant has thereby failed to sustain his heavy burden of showing that the Government's evidence was inadequate. See United States v. Engle, 676 F.3d 405, 419 (4th Cir. 2012) ("A defendant bringing a sufficiency challenge must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." (citations omitted) (internal quotation marks omitted)). Accordingly, the trial evidence was sufficient to support each of Appellant's convictions.

## IV.

Appellant received a fair trial and was duly convicted by a jury of his fellow Virginians. We have no cause to undo what has been done. The judgment of the district court is

AFFIRMED.

---

[23] Significantly, the jury found the necessary corrupt intent despite being instructed extensively on Appellant's "good faith" defense and hearing from an array of witnesses who testified to Appellant's honesty, integrity, respect for the law, and good character. The jury was instructed not only that "if a defendant believed in good faith that he or she was acting properly . . . there would be no crime," but also that "evidence of good character alone may create a reasonable doubt as to a defendant's guilt." See J.A. 7692, 7694. Appellant's character witnesses included cabinet members from his time as Governor of Virginia, as well as longtime friends such as Father Timothy R. Scully, a Catholic priest and University of Notre Dame professor who met Appellant in 1972 when they became college roommates.